**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JENNIFER RAMSEY, individually and on behalf of the Estate of James Kinder, deceased, | ) ) ) | CIVIL DIVISION |
| | ) | Civil Action No.: 2:21-cv-557-PLD |
| Plaintiff, | ) ) | |
| v. | ) | ***ELECTRONICALLY FILED*** |
| | ) | |
| THE SALVATION ARMY, A NEW YORK CORPORATION, | ) ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY**
**JUDGMENT**

Defendant filed a Motion for Summary Judgment arguing that Plaintiff's wrongful death and

survivorship lawsuit is barred due to: (1) the *in pari delicto* doctrine, (2) the failure to state proper causation

and/or (3) that Defendant did not owe a duty to the decedent, Mr. Kinder. Plaintiff's Brief in Opposition

addresses each of Defendant's arguments, and urges this Court to deny Defendant's motion for the

following reasons:

First, the *in pari delicto* argument:  Because there are disputed material facts which illustrate how

Defendant is <u>more</u> culpable than Plaintiff with respect to decedent's death, *in pari delicto* does not apply to

this case.

Second, the causation argument: By breaching its duty to timely call EMS upon observing Mr.

Kinder in an incapacitated condition, Defendant caused a 12-hour delay in calling EMS which increased

the risk of harm to Mr. Kinder. Its delay in calling EMS is a factual cause contributing to and/or causing

Mr. Kinder's death from "complications of combined drug toxicity." Contrary to Defendant's assertions,

Plaintiff <u>has</u> produced evidence (specifically a Coroner's Investigation and Toxicology Report and a death

certificate, Exhibits E and F respectively) identifying Mr. Kinder's cause of death as "complications from

drug toxicity." Regarding the two non-prescribed medications at issue in Mr. Kinder's system, the

toxicology report states that all adverse effects of Neurontin were reversible, and the blood concentration level of Tramadol in Mr. Kinder's system was significantly below a lethal threshold. (Ex. E, bates 3). This creates a genuine issue of material fact as to whether earlier medical intervention would have, at a minimum, decreased the likelihood that Mr. Kinder would have died. Expert discovery remains open, and Plaintiff anticipates calling appropriate medical experts at time of trial and is not required to do so during discovery to further prove or otherwise establish causation.

Third, the duty argument: contrary to Defendant's assertion, Plaintiff never alleged Defendant had a duty to provide medical care to Mr. Kinder, nor that Defendant had a duty to prevent Mr. Kinder from obtaining drugs and/or engaging in self-harm; rather, Plaintiff alleged that Defendant's policies clearly indicate that Defendant owed a duty to call Emergency Medical Services ("EMS") if a resident's condition warranted Defendant doing so. Defendant therefore owed a duty to call EMS because three of its workers observed Mr. Kinder in an incoherent, incapacitated and totally helpless condition.

Because each of Defendant's arguments fails Defendant's Motion for Summary Judgment must be denied.

# I.  PROCEDURAL BACKGROUND

Plaintiff initiated this lawsuit by filing a Praecipe for Writ of Summons on May 16, 2019, in the Court of Common Pleas of Allegheny County. (ECF 1-1). On March 31, 2021, Plaintiff filed a Complaint. (ECF 1-3). Defendant removed this lawsuit to the United States District Court for the Western District of Pennsylvania on April 27, 2021 (ECF 1), and shortly thereafter, filed a Motion to Dismiss on May 6, 2021. (ECF 3).

Plaintiff filed an Amended Complaint on May 26, 2021. (ECF 10). In her Amended Complaint, Plaintiff alleged Defendant's failure to follow its own written policies and procedures allowing Mr. Kinder to re-enter Defendant's facility, instead of contacting EMS when Mr. Kinder was observed being unable to walk on his own, stand on his own, and communicate, as he presented himself to the security desk worker,

increased the risk of harm to Mr. Kinder. (ECF 10). This Court denied Defendant's Motion to Dismiss as moot. (ECF 11).

Defendant filed a Motion to Dismiss Plaintiff's Amended Complaint, and brief in support. (ECF 12, ECF 13). Plaintiff filed a Response and a brief in opposition. (ECF 15, ECF 16). On January 14, 2022, this Court filed a Report and Recommendation denying Defendant's Motion to Dismiss. (ECF 17).  On February 16, 2022, the District Court adopted this Court's Report and Recommendation, denying Defendant's Motion to Dismiss for the reasons set forth in the Report and Recommendation. (ECF 19). Discovery ensued.

On February 13, 2023, Defendant filed a Motion for Summary Judgment (ECF 37), a Brief in Support (ECF 38), and Concise Statement of Material Facts. (ECF 39).

## II.    FACTUAL BACKGROUND

Plaintiff's Responsive Concise Statement of Material Facts, which Plaintiff incorporates by reference, sets forth the following material facts as relevant to the adjudication of the instant motion.

Defendant maintains the Adult Rehabilitation Center, an adult drug and alcohol facility ("Defendant's facility"), where Mr. Kinder died. (ECF 10, ¶36). Defendant, proclaims on its website that it has, "more rehabilitation facilities than any other program in America[,]" including the facility where Mr. Kinder died. (ECF 10, ¶11; ECF 39, ¶4).

Non-residents may not enter Defendant's facility without permission, and although its residents are permitted to leave the facility, Defendant's "Center Guidelines" imposes limitations and restrictions on the coming and going of its residents. (ECF 10-2). For example, Defendant's policy manual requires residents to obtain passes (i.e., permission) to leave the facility and requires residents to return to the facility 15 minutes before curfew (11 pm) and further provides that the door will be locked at 11 p.m. and once locked, no resident will be admitted. (ECF 10-2, p.11-12). Defendant requires its residents to participate in all aspects of its program, including attending classes, religious services, and performing work as therapy. (ECF 10-2, pp. 3-6; Ex. A, 25: 17-20; Ex. A, 18-19: 24-6; Ex. B, 23-24: 21-14).

Defendant's facility has a written policy which authorizes the security desk worker to demand a resident provide "a sample for compliance testing" upon the resident's return to the facility before curfew. (ECF 10-2, p. 1, "Upon return from some passes you may be required to give a sample for compliance testing."). Defendant's policies also require the security desk worker to deny re-entry to a resident if he returns to Defendant's facility and is unable to stand or walk on his own, communicate, shows signs of physical or cognitive impairment, or is under the influence of drugs or alcohol. (Ex. B, 38-39: 7-5).

In addition, Mark Unruh, the administrator in charge of Defendant's facility, admitted that the security desk worker was obligated to first call 911, and then notify Defendant's resident manager on duty if a resident returned to the facility in an incapacitated condition.  (Ex. B, 40-41: 4-4). Defendant also has a written policy requiring EMS to be called if a resident's condition warrants it. (ECF 10-2, p. 12, "During a crisis we will call an ambulance and other emergency services to assist you at your request and/or upon our observation of need.").  According to Defendant, the resident manager's job was to "make sure the rules are being followed" because Defendant's facility is a "structured environment" and "if there's a situation . . . that needs immediate attention, then they contact us, my wife or myself." (Ex. B, 29: 9-17). In sum, Defendant's policies required residents be breathalyzed and searched upon re-entry; compliance testing was to be performed to ensure the absence of non-prescription drugs; resident workers were to notify staff members about a resident's physical condition and or safety, and if necessary, the resident worker or staff member was to call EMS.

At the time of his death, Mr. Kinder was one of Defendant's residents receiving drug rehabilitation treatment while residing at Defendant's facility. (ECF 10, ¶17; ECF 39, ¶2). It was known to Defendant that Mr. Kinder was clinically depressed and shortly before the day of his death, he was at increased risk of relapse given that he had just suffered the loss of a close friend causing him to become more depressed and thus more likely to seek out and use drugs as a coping mechanism. (ECF 10, ¶ 18; Ex. B, 100: 6-20, Ex. D, 33: 13-23).

4

The night before his death, June 16, 2017, Mr. Kinder left the facility with other residents who resided with him at Defendant's facility. (ECF 10, ¶ 19). While away from Defendant's facility, Mr. Kinder, along with other residents, took over the counter and non-prescribed medication(s) in the presence of other facility residents. (Ex. A, 67: 1-15).

Due to Mr. Kinder's drug-induced incapacity, incoherence, and inability to stand or walk into the facility on his own, two of the facility residents who were with Mr. Kinder that evening, carried him back into facility. (Ex. A, 50:8-13; 54: 2-10). Undisputed testimony from Mason Kusky, one of the residents who carried Mr. Kinder back into the facility, described carrying Mr. Kinder into the facility like the corpse, "Bernie", was carried around in the movie "Weekend at Bernie's." (Ex. A, 50: 8-13). Mr. Kinder was so incapacitated that he was unable to stand or walk on his own and the two beneficiaries had to drape his arms over their shoulders to carry him into the facility. (Ex. A, 57: 1-12). One of Defendant's employees, Charlie Battle, the resident manager, saw Mr. Kinder in this condition, as he was carried by the two other residents through the parking lot after the three were dropped off by an Uber. (Ex. A, 57: 13-21; 58: 2-6). The three beneficiaries re-entered the facility in this manner and were observed by Defendant's security desk worker. (Ex. A, 50: 8-10; 55-56: 23-7; 58: 7-14).

Mark Unruh testified that Mr. Kinder's obvious, incapacitated condition met both the definition of "a crisis," and the definition of "observation of need" under Defendant's policies. (Ex. B, 43-44). Specifically, Mark Unruh testified that if a resident returns to the facility and was unable to communicate, walk, or stand on their own, the resident should be denied entry into the facility. (Ex. B, 39-40). Mark Unruh also testified that, if Mason Kusky's testimony is true, (1) it would have been a violation of Defendant's policy to allow Mr. Kinder to enter the facility; (2) the security desk worker would have an obligation and responsibility to contact another staff member; and (3) the security desk worker should have called 911. (Ex. B, 40-41).

Defendant's resident manager and security desk worker, who both observed Mr. Kinder re-enter the facility in this obvious state of incapacitation, permitted Mr. Kinder to re-enter the facility without calling

EMS.[1] The security desk worker allowed one of the other residents to sign Mr. Kinder's name on the sign-in sheet, because Mr. Kinder could not do so given his obvious incapacitated condition. (Ex. A, 71: 3-25). The residents then carried Mr. Kinder through the facility, up a two flights of stairs, and placed him in his bed.  (Ex. A, 50: 8-13). While carrying him through the building to his room, Mr. Kinder and those who carried him were observed by a third worker, Defendant's houseman. (Ex. A, 57, 58: 20-6).

Instead of following Defendant's policies and procedures, Defendant's three workers allowed Mr. Kinder to be carried to by two other residents through the parking lot, through the facility, to his room and placed into his bed unimpeded.  Mason Kusky, Mr. Kinder's roommate, testified that Mr. Kinder was alive throughout the night and the next morning. (Ex. A, 73-74). But that he found Mr. Kinder unresponsive, nearly 12 hours after they returned to the facility. (Ex. A, 61:8-11). Finally, EMS was contacted and transported Mr. Kinder by ambulance to a nearby hospital, where he died later that day of complications from combined drug toxicity at 3:36 pm on June 17, 2017. Death by drug toxicity can be prevented if timely medical intervention is provided.[2]

## III.    STANDARD OF REVIEW

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); see also *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322 (1986). see also *Melrose, Inc. v. City of Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010) (Summary judgment may only be granted if, drawing all inferences in favor of the non-moving party, "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.").

---

[1] It is undisputed that EMS was not contacted until the following morning, approximately 12 hours after Mr. Kinder returned to the facility.

[2] Plaintiff notes that Defendant did not depose any of the experts whose reports have been provided or the physicians who treated Mr. Kinder; rather Defendant opted to file the instant motion without doing so. The toxicology report indicates that the effects of one of the non-prescribed medications at issue in Mr. Kinder's system were reversible while the blood concentration level of the other was non-fatal. (Ex. E , bates 3-4). Expert discovery remains open, as no date for the close of expert discovery has been set by the Trial Court.

A fact is material if it must be decided in order to resolve the substantive claim to which the motion is directed. In other words, there is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id*. at 255. It refrains from making credibility determinations or weighing evidence. *Id*. "Real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof," will defeat a motion for summary judgment. *El v. Se Pa. Transp. Auth*., 479 F.3d 232, 238 (3d Cir. 2007).

## IV.    ARGUMENT
### A.  THE *IN PARI DELICTO* DOCTRINE DOES NOT APPLY HERE.
Defendant's *in pari delicto* argument is misplaced and inapplicable to the instant matter.

### 1.  The Doctrine
*In pari delicto* is an equitable doctrine which precludes plaintiffs from recovering damages if their cause of action is based on their own illegal conduct. *Albert v. Sheeley's Drug Store, Inc.,* 265 A.3d 442, 446 (Pa. 2021).  However, in order to apply this doctrine, "courts must consider: (1) the extent of the plaintiff's wrongdoing vis-à-vis the defendant; and (2) the connection between the plaintiff's wrongdoing and the claims asserted." *Albert,* 265 A.3d at 450, citing *Official Committee of Unsecured Creditors,* 989 A.2d at 330 n. 19.

*In pari delicto*, as a legal defense, has been applied principally in contract situations where one party seeks to enforce an unlawful contract, and where a participant in an illegal conduct seeks an accounting for related activity. *Official Com'ee of Unsecured Creditors of Allegheny Health Education and Research Foundation v. PriceWaterhouseCoopers, LLP*, 989 A.2d 313, 328 (Pa. 2010).

Importantly, the theory underlying this rule is that allowing such suits to proceed to trial would: (1) condone and encourage illegal conduct; (2) allow wrongdoers to receive compensation for, and potentially even profit from, their illegal acts; and (3) lead the public to "view the legal system as a mockery of justice." *Orzel v. Scott Drug Co.,* 449 Mich. 550, 537 N.W.2d 208, 213 (1995); *Official Committee of Unsecured Creditors,* 989 A.2d at 329 ("In this Commonwealth, as elsewhere, *in pari delicto*

serves the public interest by relieving courts from lending their offices to mediating disputes among wrongdoers, as well as by deterring illegal conduct."). *Albert*, 265 A.3d at 448.

### 2.  Pennsylvania Law Interpreting the Doctrine

Defendant contends that *Albert* controls the *in pari delicto* argument presently before this Court, and demands summary judgment in its favor predicated upon *Albert*. Plaintiff disagrees that the application of *Albert* to instant matter will lead this Court to award Defendant summary judgment.  In fact, applying *Albert* will result in the opposite outcome.

As noted by Defendant, in *Albert,* the decedent (Cody Albert) and his friend, Zachary, had substance abuse issues. Zachary's mother, who had been prescribed opiates for her medical condition would have her prescriptions filled at Sheeley's Drug Store.  On the day of Cody's death, Zachary called the drugstore, pretending to be his mother, and said "my son" will pick up the prescription. Cody drove Zachary to Sheeley's and Zachary picked up his mother's opiate prescription from the pharmacist (despite the fact that Zachary's sister had instructed Sheeley's not to provide Zachary with their mother's opiate drugs). The two boys next drove to Zachary's home, and Cody consumed some of the prescribed opiate (fentanyl) at Zachary's home, smoked some marijuana, and fell asleep at Zachary's house.  Later that night, Zachary found Cody unresponsive, and Cody was pronounced dead upon reaching the hospital.

Cody's father brought a negligence action against Sheeley's arguing that Zachary's ability to pick up his mother's opiates was the proximate cause of Cody's death.  The trial court granted summary judgment in favor of Sheeley's holding that Mr. Albert's lawsuit was barred by *in pari delicto.* The trial court, granting summary judgment in favor of Sheeley's, found that Cody (the decedent) was criminally culpable in bringing about his own death, and concluded, his father (the plaintiff) was barred by the doctrine of *in pari delicto* from suing Defendant for the role it played in his son's death. The Superior Court affirmed the decision.

On appeal to the Pennsylvania Supreme Court, a majority of the Court upheld the Superior Court's decision barring Mr. Albert from pursuing his negligence claims against Sheeley's, thereby expanding the

applicability of the *in pari delicto* doctrine to negligence cases.  However, in doing so the Supreme Court noted, "Under Pennsylvania's formulation of *in pari delicto,* courts must consider: (1) the extent of the plaintiff's wrongdoing vis-à-vis the defendant; and (2) the connection between the plaintiff's wrongdoing and the claims asserted." *Albert,* 265 A.3d at 450, citing *Official Committee of Unsecured Creditors,* 989 A.2d at 330 n. 19. The Court also stated, "[w]ith regard to the former, we have said that the plaintiff must bear substantially equal or greater responsibility for the underlying harm as compared to the defendant. . . . Furthermore, our precedent is clear that *in pari delicto*, like all equitable doctrines, is subject to appropriate and necessary limits." *Id*. The Court carefully qualified its holding by noting, "Needless to say, we do not today nor have we ever endorsed the rule that *in pari delicto* applies 'no matter the degree or seriousness of the [plaintiff's] illegality[.]' Dissenting Opinion at 454. . . . As we have explained, the doctrine contains clear limits that, by the Dissent's own admission, Albert does not argue apply here." *Id*., fn. 7.

### 3.  Application of *Albert* to the Facts Presented

Turning to this case, Plaintiff argues the "clear limits" apply to this case, contrary to Defendant's request that this Court apply, automatically and blindly, the *in pari delicto* doctrine without first considering the two-prong test noted above which yields a completely different outcome given the vastly different set of facts present here.

First, in this case, unlike the *Albert* case, Defendant, a residential rehabilitation facility, had a direct relationship with and expected at least some of its addicted residents to relapse while residing at its facility. Dan Coombs, Defendant's corporate designee, testified that Defendant knew that recovering alcohol and/or drug addicts may succumb to alcohol or drug use while in the program, which was precisely why Defendant's polices were created and why compliance testing and breathalyzer tests were required. (Ex. C, 43: 7-21). As such, Defendant owed a duty to protect its residents, including Mr. Kinder, from themselves and the consequences of such behavior by calling EMS upon observation of the need for such services.

Second, unlike *Albert*, Defendant owed a direct duty to Mr. Kinder as evidenced by Defendant's policies requiring: (1) its workers to perform compliance testing to ensure the absence of non-prescription

drugs; (2) residents to be screened and searched upon their return to the facility; (3) residents to sign-in upon their return to the facility; (4) the security desk worker to notify a staff member if a resident returned to the facility under the influence of drugs or alcohol or otherwise in an incapacitated condition; (5) the security desk worker to deny re-entry to any resident who returns under the influence of drugs or alcohol; and (6) that EMS be called should a resident require medical assistance or attention. <u>Defendant's corporate designee acknowledged that Mr. Kinder's condition would warrant calling EMS and that he personally would have called EMS</u>. (Ex. C, 12: 5-20).

Third, unlike *Albert* where the decedent was an unknown stranger to the pharmacy, such that the pharmacy defendant could never reasonably anticipate Cody's use of non-prescribed drugs, Defendant here, knew of its residents' propensity to use non-prescribed and/or illicit drugs and/or alcohol while in treatment and developed and implemented specific policies to mitigate the consequences of such conduct. As noted above, no such policies would even exist if Defendant did not expect at least some of its residents to use drugs or alcohol while away from Defendant's facility. (Ex. C, 43: 7-21).

Fourth, unlike Sheeley's in *Albert* (who did not know Cody even existed, let alone may need any sort of EMS intervention), Defendant in this case saw Mr. Kinder in desperate need of EMS, and chose to ignore him. The night before Mr. Kinder died, Defendant's resident manager, security desk worker, and houseman, all ignored Defendant's polices, and instead, turned a blind eye to Mr. Kinder who had to be carried into the facility because he was so incapacitated that he couldn't stand, walk, or talk. (Ex. A, 75-76). The security desk worker even allowed Mason Kusky to sign Mr. Kinder's name on the sign-in sheet because Mr. Kinder, due to his incapacitation, was completely unable to do so. (Ex. A, 75: 4-9). Charlie Battle, the resident manager whose job duties required him to ensure the facility's rules and policies were being followed (including contacting EMS and other staff members about a resident's physical condition and or safety), flagrantly ignored those rules as he watched Mr. Kusky and Mr. Naylor carry Mr. Kinder from the Uber into the facility, because he was unable to walk or stand on his own. (Ex. A, 76: 1-19). Clearly, both Defendant's security desk worker and the resident manager on duty that night violated

Defendant's policies which, in turn, grossly delayed the medical care Mr. Kinder needed in order to survive.

Moreover, Mark Unruh admitted that if Mr. Kinder could not walk or stand on his own but was allowed re-entry into Defendant's facility the night before he died, his admittance would violate Defendant's policies. Mark Unruh also admitted Defendant's policies would have been violated if Mr. Kinder was allowed re-entry: (1) in such an obvious state of impairment that he couldn't communicate in an understandable way, (2) but was not breathalyzed on his way into the facility by the security desk worker, and (3) but was unable to walk, stand, or communicate on his own behalf in an understandable way. (Ex. B, 40-41: 4-11). Finally, Mark Unruh admitted Defendant's policies would have been violated if the desk worker, after observing Mr. Kinder's state of impairment, did not first call 9-1-1 and then call the resident manager on duty. (Ex. B, 41: 2-11).

Fifth, unlike *Albert,* Defendant knew: (1) its specific policies referenced above had been repeatedly violated in the past[3], and (2) Mr. Kinder was at increased risk of using drugs given that he had just suffered the loss of a close friend causing him to become more depressed and thus, more likely to seek out and use drugs as a coping mechanism. (Ex. B, 100: 15-22).

In sum, in *Albert*, Sheeley never assumed any duty with respect to Cody – a friend of the son of a prescription holder – and never could have, because of the attenuated relationship, if any, between Cody and the pharmacy. Conversely, Defendant in this case owed a direct duty to Mr. Kinder, its resident, as articulated and set forth explicitly in its written policies discussed above, as well as expressed by Defendant's facility administrator, Mark Unruh, and its corporate designee, Dan Coombs.  In *Albert,* Sheeley had no way of knowing that its customer's, son's, friend, Cody, (a complete stranger to Sheeley's),

---

[3] Mr. Kusky testified that the Defendant deliberately turned a blind eye to drug and alcohol use by residents and the atmosphere was very lax and residents could get away with violating polices if they tried (Ex. A, 81: 4-17); drug and alcohol use by beneficiaries was widespread in the facility (Ex. A, 39); he reported drug use to the resident manager, Charlie Battle (Ex. A, 40-41); and Defendant's workers failed to follow the check-in procedures and failed to breathalyze residents upon their return 1/3 to 50% of the time (Ex. A, 35:1-25).

would ingest the prescribed drugs and die.  Conversely, Defendant in this case expected some its residents to abuse drugs and/or alcohol while recovering from their addictions, had policies in place to assist and save the lives of those residents if and when they did use drugs or alcohol, knew that its life-saving policies were not being followed, yet did nothing to enforce those policies. Moreover, Defendant specifically knew that Mr. Kinder was at increased risk for drug-seeking behavior given his personal struggle over the loss of his friend in the days leading up to his death.  All of the factual distinctions between this case and *Albert* should lead to a different outcome, in the instant matter.

### 4. Application of the Two-Part *Albert* Test

Turning next to the *Albert* two-prong test, this Court must consider: (1) the extent of the plaintiff's wrongdoing vis-à-vis the defendant; and (2) the connection between the plaintiff's wrongdoing and the claims asserted.[4]  When considering how these two parts of the test apply to the instant factual situation and the relationship between Defendant and the decedent, Mr. Kinder, this Court must also bear in mind a decision from United States Supreme Court.

The United States Supreme Court held that the *in pari delicto* doctrine is grounded on two premises: "First, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299 (1985). "In cases where both parties are *in delicto*, concurring in an illegal act, it does not always follow that they stand *in pari delicto*; for there may be, and often are, very different degrees in their guilt. Thus, there might be an inequality of condition between the parties, or a confidential relationship between them that determined their relative standing." *Id*. at 307.

In *Bateman*, investors filed a lawsuit against a broker and the brokerage company that induced them to purchase large quantities of stock by divulging false and materially incomplete information about the

---

[4] Plaintiff notes that she did nothing wrong; rather, it is decedent (Mr. Kinder), who Defendant alleges engaged in wrongdoing.  Unfortunately, the *Albert* Court majority opinion failed to explain how or why the decedent's (Cody's) alleged wrongful acts, were imputed to his surviving parent/plaintiff who had an independent claim for wrongful death, as compared to the estate's survival claim.

company on the pretext that it was accurate "inside" information. *Id*. Once the investors bought the stock based on what was inaccurate information, the stock price became inflated, and the broker and his company benefited financially. Id., at 303.  The District Court dismissed the investors' claim citing the *in pari delicto* doctrine, reasoning that trading on insider information was itself an illegal act, which barred them from recovery. *Id*.

The United States Court of Appeals for the Ninth Circuit reversed, holding that although the investors had violated the securities law by illegally acting on what they believed to be accurate insider information, the broker and his brokerage company who allegedly engaged in fraud should not be permitted to invoke *in pari delicto* to shield themselves from their own fraudulent conduct.

On appeal, the Supreme Court affirmed the Court of Appeals' decision, holding that there was no basis for concluding that the investors were *in pari delicto* with the broker because the broker and the brokerage company "masterminded this scheme to manipulate the market . . . for their own personal benefit, and that they used the purchasing investors as unwitting dupes to inflate the price of stock." *Id*. at 314. The Supreme Court cited to *Stewart v. Wright*, where the court stated, "actions that, if they occurred, were far more culpable under any reasonable view than the respondents' alleged conduct," are not barred by the *in pari delicto* doctrine as a matter of public policy. *Stewart v. Wright,* 147 Fed. 321, 328–329 (CA8), *cert. denied,* 203 U.S. 590 (1906). Given the alleged "far more culpable" actions of the broker and brokerage company as compared to the wrongdoing investors, the Supreme Court determined that *in pari delicto* would not bar the wrongdoer investors from suing the broker and brokerage company.

Here, given the totality of the factual circumstances and evidence presented to date, Defendant is more culpable than Mr. Kinder, and thus, just like *Bateman,* the *in pari delicto* doctrine should not operate to bar Plaintiff from either her wrongful death or survival claims.

First, there is ample evidence of record which clearly illustrates that Defendant owed a duty to Mr. Kinder to call EMS based upon an observation of need -- specifically, Defendant's above-discussed

policies and procedures, as well as its designee's and employees' testimony. On the night in question, Mr. Kinder's incapacitated condition undisputedly warranted calling EMS, but Defendant failed to do so.

Second, evidence exists demonstrating that Defendant, as a residential rehabilitation facility, expected at least some of its residents to seek out and use drugs or alcohol during their stay at the facility. Defendant admitted through its corporate designee that as a result of this expectation, it instituted the above-discussed policies and procedures to protect its residents, including Mr. Kinder from the consequences, including death, of such conduct.

Third, the evidence further establishes that Defendant knew these very policies and procedures were ignored but did nothing to enforce them.

Fourth, Plaintiff adduced evidence further demonstrating that Defendant knew Mr. Kinder suffered from clinical depression and knew he had recently suffered a loss that was likely to cause him to seek out drugs and use them as a coping mechanism.

Fifth, evidence exists which proves that at least three of Defendant's workers – its resident manager, security desk worker, and houseman – personally observed decedent's incapacitated condition the night before his death but ignored the policies and procedures requiring EMS to be called, which would have led to Mr. Kinder receiving <u>timely</u>, lifesaving, medical assistance that evening.[5]

Given this mountain of evidence supporting Plaintiff's claim, that same evidence further demonstrates that Defendant was more culpable than the decedent under the facts presented, and thus, the doctrine of *in pari delicto* is inapplicable to the instant matter.

### B. PLAINTIFF HAS DEMONSTRATED SUFFICIENT CAUSATION AND IS NOT REQUIRED TO PRODUCE EXPERT TESTIMONY AT THIS JUNCTURE

Defendant suggests that because Plaintiff failed to specify Mr. Kinder's cause of death (complications from combined drug toxicity) in her Amended Complaint, but instead alleged Defendant

---

[5] Again, Defendant may depose Plaintiff's experts before the close of expert discovery and/or opt to cross-examine such experts at trial, but Defendant cannot shift the burden to Plaintiff to elicit such testimony at this stage of the litigation.

bore the responsibility for Mr. Kinder's death, this case should be dismissed.  In addition, Defendant claims that a jury will have to speculate as to what caused Mr. Kinder's death, and for this reason the instant lawsuit should be dismissed.  Both assertions are wrong.

First, as a housekeeping matter, notice to Defendant of the cause Mr. Kinder's death is not at issue. Defendant knew the cause of Mr. Kinder's death in "real time" and has possessed the Erie County Coroner's Investigation Report, which includes the toxicology report, along with Mr. Kinder's death certificate since the inception of this litigation.

Second, Pennsylvania has an "increased risk of harm" standard regarding causation. Thus, Plaintiff can satisfy her burden of proof on causation by demonstrating that Defendant's conduct at issue increased the risk of harm to Plaintiff. Section 323 of the Restatement (Second) of Torts, "Negligent Performance of Undertaking to Render Services," provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if:

(a) His failure to exercise such care increases the risk of such harm, or
(b) The harm is suffered because of the other's reliance upon the Undertaking.

Section 323 of the Restatement (Second) of Torts.

Interpreting this portion of the Restatement, the Supreme Court of Pennsylvania held:
Once a plaintiff has introduced evidence that a defendant's negligent act of omission increased the risk of harm to a person in a plaintiff's position, and that the harm was in fact sustained, it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm.

*Hamil v. Bashline,* 392 A.2d 1280, 1286 (Pa. 1978). The Pennsylvania Supreme Court further explained:

It is not necessary that the plaintiff introduce medical evidence in addition to that already adduced to prove defendant's conduct increased the risk of harm to establish that negligence asserted resulted in plaintiff's injury. Rather, once the jury is apprised of the likelihood that the defendant's conduct resulted in plaintiff's harm, that Section leaves to the jury, and not the medical expert, the task of balancing probabilities.

*Id*. at 273. Whether, in a particular case, that standard has been met with respect to the element of causation, is a question of fact for the jury; the question is to be removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue. *Id*.

The relationship between Defendant and Mr. Kinder (as pled by Plaintiff in her Amended Complaint), falls under Section 323(a). Defendant's policies explicitly state that Defendant would contact EMS for a resident such as Mr. Kinder upon "observation of need" or during a "crisis" and Defendant's witnesses admit that Mr. Kinder's incapacitated condition would qualify as such. Defendant is therefore, "subject to liability to [Plaintiff] for physical harm resulting from [Defendant's] failure to exercise reasonable care to perform [its] undertaking," because "Defendant's failure to exercise such care increases[d] the risk of such harm."

Plaintiff has adduced the following facts during discovery: According to Mr. Kinder's roommate, Mr. Kusky, Mr. Kinder was so incapacitated that he was unable to stand or walk on his own he had to be carried into the facility, and he was put in his bed by other residents. (Ex. A, 50: 8-13; 57: 1-12). Mr. Kinder was breathing and snoring throughout the night and into the next morning before being found unresponsive. (Ex. A, 74-75: 22-3). After being found unresponsive in his bed, EMS was finally contacted, and upon arrival, resuscitated Mr. Kinder. (Ex. H, bates 20). After EMS transported Mr. Kinder to the hospital, Mr. Kinder was admitted to the hospital in critical condition, intubated, and placed on dialysis. (Ex. I, bates 26). Mr. Kinder survived until later that afternoon when he died at the hospital at 3:36 pm. (Ex. I, bates 34).

In short, this evidence creates a genuine issue of material fact that Defendant's delay in calling EMS increased the risk of harm to Mr. Kinder. Plaintiff has adduced evidence in the form of testimonial evidence illustrating how at least three of Defendant's workers ignored various policies by allowing Mr. Kinder to re-enter the facility in an incoherent and incapacitated state without calling EMS. The failure to call EMS greatly increased the risk of harm to Mr. Kinder. Moreover, Plaintiff is not required to "prove" causation in order for her claims to survive Defendant's motion for summary judgment; rather, she must merely demonstrate that there are material facts in dispute (which she has).

Plaintiff's Amended Complaint properly alleged that Defendant owed a <u>duty</u> to Mr. Kinder to call EMS upon observation of need while Mr. Kinder resided at Defendant's facility. (ECF 10, ¶¶ 37, 38).

Plaintiff's Amended Complaint also properly alleged that Defendant breached its duty when it failed to adhere to, and/or enforce, its own policies, specifically the policy requiring Defendant to contact EMS when Mr. Kinder attempted to re-enter the facility.  Evidence of record illustrates how Defendant's breach greatly increased the risk of harm to Mr. Kinder. Not only does this satisfy the required level of causation under *Bashline*, but it also constitutes a breach of Defendant's duty under Section 323 of the Restatement. Accordingly, given the evidence, causation is an issue that cannot be decided by way of Defendant's summary judgement motion; rather, it presents questions of fact for a jury – specifically, (1) whether Mr. Kinder was so incapacitated that his re-entry to the facility should have been denied and EMS called and (2) whether Defendant's failure to call EMS for medical intervention the night before Mr. Kinder died, increased Mr. Kinder's risk of harm constituting a factual cause contributing to Mr. Kinder's death.

Finally, at this moment in time, expert discovery remains open and thus, Defendant's decision to move forward and present this summary judgment motion without first taking the depositions of some or all of the medical professionals who established that Mr. Kinder died of complications from combined drug toxicity, was its own choice. Such professionals are experts who may be called by Plaintiff at trial and, as such, Plaintiff is not required to take their discovery depositions to "prove causation" at this stage of the legal proceedings.

## C.  DEFENDANT HAS A DUTY

Defendant's third argument is merely a regurgitation of its motion to dismiss, namely that it does not owe Plaintiff a duty, and its "no duty" argument should likewise fail now for the same reasons substantively as well as procedurally because of the law of the case doctrine. (ECF 13, pp. 6) (ECF 38, pp. 11). This Court may consider the duty argument moot: (1) if this Honorable Court agrees with Plaintiff's arguments set forth above in "A." and "B.," and/or (2) because Defendant simply restates that which was argued and decided previously during the Motion to Dismiss stage of these proceedings. If the Court disagrees with Plaintiff's position(s) above and does not find that Plaintiff has adduced evidence which

create material facts as to whether Defendant owes a duty, Plaintiff proffers the responsive arguments below.

**1. Defendant Owed a Duty Predicated Upon §§ 323-324 of the Restatement (Second) Of Torts.**

Defendant owed Mr. Kinder a duty of care based upon §§ 323-324 of the Restatement (Second) of Torts.  Defendant breached its duty when it allowed Mr. Kinder to re-enter its facility while visibly incapacitated without contacting EMS. Notably, Defendant raised this same argument in their Motion to Dismiss, which was denied. (ECF 3). In renewing its argument, Defendant once again attempts to argue that it was not a licensed medical provider and did not owe a duty to provide medical care to Mr. Kinder. Plaintiff has never alleged that Defendant owed a duty to provide medical <u>care</u> to Mr. Kinder. (ECF 13, pp. 7) (ECF 38, pp. 12-13). Rather, Defendant's duty as a residential rehabilitation facility arises out if its relationship with Mr. Kinder, a resident in its facility, and its written policies which required Defendant to contact EMS if Mr. Kinder was in "crisis" or upon "observation of need." Contrary to Defendant's assertions, Plaintiff has specifically plead and subsequently proven through Defendant's witnesses, that Defendant's facility is a private, locked facility that limits the coming and going of residents and requires them to go through screening to re-enter the facility. (ECF 10-2; Ex. B, 22-23; Ex. B, 38-41). Plaintiff's argument in this regard is restated below.

This Commonwealth has adopted §§ 323 and 324 of the Restatement (Second) of Torts. *Filter v. McCabe*, 733, A.2d 1274, 1277 (Pa. Super. Ct. 1999). §323 is stated and explained above.

Section 324 states that:

> One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused by him:
>
> (a) The failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or
> (b) The actor's discontinuing his aid or protection, if by so doing he leaves the other in worse position than when the actor took charge of him.

Defendant took charge of another (Mr. Kinder) who was helpless, and so incapacitated that he was unable to stand, walk, or talk on his own. Defendant's failure to exercise reasonable care to call EMS while

Mr. Kinder was within Defendant's charge constitutes a breach of its duty under § 324 of the Restatement (Second) of Torts. Accordingly, Plaintiff's Complaint has sufficiently set forth a cause of action based upon Defendant's duties under §§ 323 and 324 of the Restatement (Second) of Torts.

As discussed in detail below, Pennsylvania case law interpreting the scope of a defendant's duty under §§ 323 and 324 of the Restatement (Second) of Torts in very similar and analogous circumstances clearly supports imposing a duty on Defendant.

In *Filter*, the plaintiff attended a party at the defendant's home, and after becoming intoxicated, the plaintiff fell and struck his head, rendering him unconscious. *Filter v. McCabe*, 733, A.2d 1274, 1277 (Pa. Super. Ct. 1999). The defendant revived the plaintiff and put him on the couch, presumably to "sleep it off." *Id*. The next morning, the plaintiff left without telling anyone. *Id*. The defendant called the plaintiff's home to see if plaintiff made it there safely and spoke with the plaintiff's wife, but did not inform her of plaintiff's fall until he called back an hour later at which point the plaintiff's wife checked in on the plaintiff and found him unresponsive. *Id*. She then called emergency services who transported plaintiff to the hospital where he was diagnosed as suffering permanent brain damage. *Id*. The Pennsylvania Superior Court, noting that although the defendant witnessed the plaintiff's fall, the defendant never contacted the plaintiff's family until the next morning nor sought medical assistance and instead simply placed plaintiff on a sofa. *Id*. Based on these facts, the court believed that it was clear that the defendant took charge of the helpless plaintiff after his fall and the defendant owed plaintiff a duty of care pursuant to §§ 323 and 324 of the Restatement (Second) of Torts and that the defendant breached that duty by not calling emergency services. *Id*.

The instant matter presents a much stronger case of negligence than the circumstances in *Filter*. Unlike *Filter*, which involved a private homeowner, Defendant is a commercial treatment facility, specializing in adult rehabilitation care for recovering addicts. As discussed above, testimony from Mark Unruh and Donald Coombs illustrate that Defendant knew that at least some its residents would use and drugs and alcohol while in treatment, staying at its facility.  (Ex. B, 60-61; Ex. C, 42-44). Given this

expectation, Defendant had policies and in place to help its workers and employees to mitigate the consequences of such conduct – specifically a policy to call EMS upon observation of need. Both Mark Unruh and Donald Coombs conceded that if they had personally observed someone (like Mr. Kinder), who could not walk or stand on his own without assistance, nor communicate or respond to questions, (1) they would consider that person in need of EMS; and (2) EMS should be called.  (Ex. B, 39-40; Coombs, 11: 1-7).

Defendant, based upon its policies and procedures, owed a key additional duty (to call an ambulance or EMS, during a crisis based or upon an observation of need) that was not present in *Filter*. Accordingly, pursuant to and consistent with the analysis in *Filter,* Defendant owed a duty of care to Mr. Kinder pursuant to §§ 323 and 324 of the Restatement (Second) of Torts. *See also*, *Piazza v. Young*, 403 F. Supp. 3d 421, 427 (M.D. Pa. 2019) (court held defendant fraternity brothers assumed a duty by rendering aid to an intoxicated student who fell down the steps by carrying him upstairs and placing him on a couch but breached their duty by not contacting emergency services.).

## 2.  Alternatively, Defendant Voluntarily Adopted Duties

Under Pennsylvania law, if a person or corporation voluntarily adopts a duty, that person can be held liable for a breach of the voluntarily adopted duty. In *Piazza, supra*., the defendant-fraternity enacted policies and regulations that declared hazing activities as absolutely forbidden, and enacted a risk management policy, declaring activities which encouraged excessive drinking were forbidden, and banned alcohol from any recruitment activity. 403 F.Supp.3d 421 at 432. The Court in *Piazza* found that the defendants voluntarily adopted those duties and that they were bound by the fraternity's policies and regulations and necessarily rejected the defendants' claims that imposing such duties was burdensome or that the specific harm that befell Mr. Piazza was too remote and unforeseeable. *Id*.

Like *Piazza*, Defendant in this case voluntarily enacted policies thereby adopting certain duties that it owed to Mr. Kinder and to all of its residents. Defendant in its Center Guidelines, states:

"All program participants and their guests are subject to a breathalyzer test to confirm the absence of alcohol. No person is allowed to enter the facility or remain on the premises while under the influence of any amount of alcohol. **The program staff will also perform compliance testing on program participants to ensure the absence of non-prescribed drugs** ... **During a crisis we will call an ambulance and other emergency services to assist you at your request and/or upon our observation of need."**

(ECF 10-2, ¶ ¶ 6, 11) (emphasis added).

These policies demonstrate that Defendant voluntarily agreed to perform certain duties under certain circumstances that were clearly met in this case. Three of Defendant's workers observed the impaired, incoherent, and helpless condition of Mr. Kinder upon re-entry and had the opportunity <u>and</u> <u>obligation</u> under Defendant's policies to contact EMS. Moreover, Dr. Stuart Gitlow, Plaintiff's expert, has indicated that Defendant, based upon its policies, had a duty to call EMS given Mr. Kinder's condition. (Ex. G) By failing to do so, Defendant breached the duty owed to Mr. Kinder. Had Defendant simply followed its own policies, Mr. Kinder's death would have been avoided.

### 3. Alternatively, Defendant Owed a Common Law Duty to Contact Emergency Services under the *Althaus* Factors

As set forth above, a duty should be imposed on Defendant under §§ 323 and 324 of Restatement (Second) of Torts and because Defendant voluntarily adopted a duty to contact emergency services upon observation of need or during a crisis, rendering further analysis moot. However, if this Honorable Court should decide that no duty should be imposed on Defendant under §§323 and 324 and that Defendant did not voluntarily adopt a duty pursuant to its Center Guidelines, a duty should still, nonetheless, be imposed based upon the *Althaus* factors, for the reasons set forth below.

In Pennsylvania, duty has been defined in the negligence context as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another. *Atcovitz v. Gulph Mills Tennis Club, Inc.*, 812 A.2d 1218, 1222 (2002) quoting *W. Page Keeton et al.*, Prosser and Keeton on the Law of Torts §53 at p. 356 (5th ed. 1984). The legal concept of duty varies depending upon the circumstances but is nevertheless inextricably intertwined with and necessarily rooted in public policy considerations and social utility principles. As such, the extent of an individual's duty to another person is

therefore variable and depends upon the probability and magnitude of the potential harm as well as the cost or burden of guarding against the potential harm. See *Karle v. National Fuel Gas Distribution Corp.*, 448 F. Supp.753 (W.D.Pa. 1978).

Based on the above principles, the Pennsylvania Supreme Court in *Althaus v. Cohen*, 756 A.2d 1166 (Pa. 2000), established five factors which Pennsylvania courts are to analyze to determine whether a common law duty of care exists in a particular situation. Those five factors which are to be considered and balanced in determining whether a common law duty of care exists in a particular situation are:

(1)  The relationship between the parties;
(2)  The social utility of the actor's conduct;
(3)  The nature of the risk imposed and foreseeability of the harm incurred;
(4)  The consequences of imposing a duty upon the actor; and
(5)  The overall public interest in the proposed solution.

756 A.2d at 1169.

The five *Althaus* factors as applied to this case, clearly favor a finding that Defendant owed a common law duty of care to Mr. Kinder.

The first factor, the relationship between the parties, weighs heavily in favor of imposing a duty on Defendant. Mr. Kinder, as resident at Defendant's adult residential rehabilitation facility, and Defendant had a special and unique relationship with its residents. Residents, such as Mr. Kinder, enter Defendant's residential program during the most vulnerable time in their life and rely on facilities such as Defendant's to provide them with a safe environment and rehabilitation. As noted above, Defendant's residential rehabilitation program and imposed restrictions, requirements, and limitations on all of its residents through its policies – including Mr. Kinder. Defendant's facility was a "secure facility" with sign-in and lock-down procedures. Further, Defendant agreed to contact EMS upon an observation of need or during a crisis. Even if Defendant didn't have policies creating a duty to call EMS upon an observation of need or during a crisis, a duty existed based upon the rationale in *Filter* and *Piazza*. The nature of the relationship in this instance was a professional rehabilitation center who allowed a resident to re-enter its facility in a helpless and impaired condition, which constitutes "taking charge" or "being in control" in the context of duty – just

like the homeowner in *Filter* and fraternity in *Piazza,* Defendant here provided overnight housing to a person who was incapacitated and thus, a duty existed. Finally, if it was not up to Defendant to contact emergency services, who would? By confiscating residents' cell phones, limiting when they could leave and re-enter the facility, and not allowing the use of personal vehicles, Defendant controlled and limited its residents' access to resources outside the facility. The relationship between the parties unequivocally favors imposing a duty on Defendant.

The second factor – social utility – weighs in favor of imposing a duty on Defendant. By holding itself out as an adult rehabilitation center, its duty to care for and protect its residents is self-evident and cannot be credibly disputed. As such, public policy/social utility demands that these treatment facilities take appropriate measures to safeguard against the harm that occurred in this case. Inherent in operating an adult rehabilitation center is the recognition that beneficiaries are in a vulnerable position and may begin re-using alcohol or drugs. Defendant recognizes this likelihood and appreciates the importance and potential need to contact EMS upon an observation of need or during a crisis, otherwise, it never would have enacted written policies requiring it to do so.

Defendant claims it would be impossible for it to prevent adult beneficiaries from consuming drugs and/or alcohol off of the premises**.** (ECF 38, pp. 15).  However, this case is not about the ingestion of non-prescription drugs or alcohol off premises. Rather, it concerns the Defendant: (1) taking custody of Mr. Kinder when he was utterly helpless and so impaired that he could not walk or talk, and (2) failing to contact emergency services once Defendant recognized his level of impairment but allowed him to re-enter Defendant's facility. Requiring Defendant to pick up the phone and call EMS is not an imposition since it promised residents that it would do so based upon an observation of need. Thus, imposing a duty upon Defendant in the instant matter, does not create any onerous burden. More importantly, imposing a duty on it to contact emergency services just maintains the *status quo* of what Defendant agreed to do in the first instance. Perversely, not imposing a duty on Defendant to contact emergency services would lessen the duty of care that it voluntarily promised to provide residents such as Mr. Kinder.

Further, Defendant's suggestion that imposing liability on it for not determining whether emergency medical care was necessary would dissuade it and other counseling centers from helping those in need, is without merit. (ECF 13, pp. 10) (ECF 38, pp. 15-16). While creating its Center Guidelines, Defendant did not think that it was a burden to call EMS upon an observation of need or crisis. Otherwise, why would Defendant adopt such a burden. Both Pennsylvania state and federal courts have spoken loudly and clearly on this issue and concluded that calling EMS is not an onerous burden. See *Filter* and *Piazza, supra*. Moreover, based upon the specific facts in this case, a proverbial "blind person" could see that it was necessary to contact EMS. Yet, Defendant did not make a simple phone call for help. Thus, you can't "dissuade" a defendant from doing something (calling for EMS) it has already failed to do. Liability should be imposed upon Defendant for many reasons, including to incentivize the social utility of professional rehabilitation centers contacting EMS when their residents are unable to walk or talk.

In essence, Defendant is urging this Court to refuse to impose a duty that it acknowledges it has (call for EMS) and suggests that the duty was created and solely adopted for the benefit of the organization and not for the benefit of its residents. (ECF 13, pp. 10) (ECF 38, pp. 15-16). This statement flies in the face of well-settled Pennsylvania law. Again, as previously discussed, Pennsylvania law clearly and unequivocally provides that if a defendant adopts a duty and breaches it, it can be liable See *Piazza, supra*. Accordingly, Defendant's assertion that it should not be liable because the guidelines were promulgated for its own benefit is not only contrary to Pennsylvania law but is self-serving and offensive. If contacting EMS upon observation of need isn't a benefit to the residents, then the word "benefit" ceases to have meaning.

The third factor – the nature of the risk imposed, and the foreseeability of the harm incurred – also weighs in favor of imposing a duty on Defendant. In a particular situation, conduct is negligent if the harmful consequences could have reasonably been foreseen and prevented by the exercise of reasonable care. *Lerro v. Thomas Wynne*, Inc., 301 A.2d 705 (Pa. 1973). Under Pennsylvania law, the type of foreseeability that determines a duty of care is not dependent on the foreseeability of a specific event.

*Moran v. Valley Forge Drive-In Theater, Inc.*, 246 A.2d 875, 878 (Pa. 1968) (upholding a verdict for a plaintiff who lost hearing when firecrackers exploded in the restroom of defendant's movie theater). Rather, the concept of foreseeability deals with perceiving the overall likelihood of the occurrence of a general type of risk as opposed to perceiving the likelihood of the occurrence of the specific chain of events leading to a particular type of injury. *Kleinknecht v. Gettysburg College*, 989 F.2d 1360, 1369 (3rd Cir. 1993).

In *Kleinknect*, a twenty-year-old college athlete suffered a cardiac arrest during practice and his family sued Gettysburg College arguing that the college had a duty of care to respond swiftly and adequately to a medical emergency. *Id*. at 1369. The District Court held that the college did not have a duty because the cardiac arrest suffered by a twenty-year-old college athlete with no history of any severe medical problems was not reasonably foreseeable. *Id*. at 1370. However, on appeal, the Third Circuit Court of Appeals stated that the District Court's definition of foreseeability was too narrow. *Id*. The Court reasoned that while the specific risk that a collegiate athlete may suffer a cardiac arrest may he unforeseeable, the Plaintiffs produced ample evidence that a life-threatening injury occurring during participation in an athletic event was reasonably foreseeable. *Id.* Therefore, the Third Circuit Court of Appeals held that the college owed the collegiate athlete a duty to take reasonable precautions against such a risk of death while an athlete was participating in its athletic program. *Id.*

Based on the above, the foreseeability of the harm to Mr. Kinder is clear. First, as a professional adult rehabilitation center, it is not simply foreseeable, but inevitable that some residents will use drugs or alcohol during their residency and return, under the influence, to Defendant's facility. Defendant knew this as exemplified by the testimony of its corporate designee who stated that recovering alcohol and/or drug addicts may succumb to alcohol or drug use while in the program and that was precisely why Defendant's polices were created. Therefore, any suggestion by Defendant that such an occurrence is unforeseeable is belied by its policies, the testimony of its corporate designee and witnesses as well as common sense.

Defendant also contends that imposing a duty to determine when medical care may be necessary or to provide medical care is far beyond the scope of the counseling that Defendant undertakes. (ECF 13, pp.

10) (ECF 38, pp. 16). This argument must fail for three reasons: (1) it does not take a medical professional to determine that a recovering addict who is unable to walk or talk may require medical attention; (2) it agreed to contact emergency services based upon "observation of need" or during a "crisis"; and (3) Defendant is not being asked to provide medical care - it is simply being asked to pick up the phone and call EMS. Further, Defendant's assertion is baffling on a practical level. If Defendant was unsure of how to determine when medical care was necessary, why adopt a policy requiring them to call an ambulance or emergency medical services during a "crisis" or "based upon an observation of need." Clearly, at the time Defendant enacted its policy, it had an understanding of when it may be necessary to contact medical services. Defendant cannot now "play dumb" on this issue in litigation.

Further, both Pennsylvania state and federal courts have spoken loudly and clearly concerning the duty of care owed to a helpless intoxicated person and have imposed a duty of care on individuals in such situations. When anyone takes charge of an impaired and helpless person, they have a duty to call emergency medical services/911. See *Filter* and *Piazza, supra*. Similarly, the foreseeability of the harm in this situation is crystal clear. In fact, it's not simply foreseeable but inevitable that harm may occur if an adult rehabilitation facility permits a resident, who is so impaired that they can't talk or walk, to re-enter the facility and allows them to be "stowed away" in a private room without contacting emergency services. It is beyond any credible dispute that the harm that occurred to Mr. Kinder both generally and specifically was foreseeable.

The fourth factor – the consequences of imposing a duty on Defendant – weighs in favor of doing so. Importantly, there would be no consequences associated with imposing a duty on Defendant in the instant matter. Plaintiff is, in essence, seeking to "impose" the very same duty (call emergency services) that Defendant voluntarily adopted. In short, Plaintiff wants Defendant to honor its promise to residents. By voluntarily adopting this requirement, it has a duty to perform it non-negligently. There would be no increased duty or burden imposed on the Defendant in the instant matter. To the contrary, imposing a duty upon the Defendant would be consistent with its own policy (Center Guidelines) and maintains the status

quo. Thus, Plaintiff is not asking the Court to impose any new duty on Defendant. Rather, Plaintiff is simply requiring that Defendant "practices what it preaches." Moreover, imposing a duty would be consistent with Pennsylvania law in these circumstances as set forth in *Filter* and *Piazza*.

Defendant cites to case law that stands for the proposition that the fourth *Althaus* factor is not satisfied where a plaintiff is more responsible for his or her harm than the defendant. (ECF 13, pp. 11) (ECF 38, pp. 17). Again, Defendant misses the crux of this analysis. The issue is not whether Mr. Kinder placed himself in harm's way by using non-prescribed drugs. For example, in *Piazza*, the decedent engaged in illegal conduct (underage drinking) yet a duty still existed. Thus, the mere fact that Mr. Kinder took non-prescribed medication, should not relieve a Defendant from its duty to call for help. The far greater harm occurred because Defendant allowed Mr. Kinder to be carried to his room in a helpless state and to be "stowed away" to "sleep it off" without calling for help. The harm here resulted from Defendant allowing Mr. Kinder re-entry into its facility in an incapacitated and helpless state and failing to contact EMS upon observation of Mr. Kinder's condition.

Defendant suggests that it is "impossible to determine where its duty would reasonably end." (ECF 13, pp. 11-12) (ECF 38, pp. 17). To the contrary, it is very simple to determine where Defendant's duty would end  -- exactly where it says it does in its Center Guidelines, by calling EMS. Again, Plaintiff's allegations of negligence do not directly nor indirectly allege that Defendant should have provided medical care to Mr. Kinder. Rather, Defendant persistently overlooks that the primary thrust of the negligence case involves Defendant's failure to call for EMS given Mr. Kinder's condition upon re-entry. (ECF 10, ¶ 43 a-m). The simple act of picking up the telephone and calling EMS would have ended Defendant's duty as it applies to the facts of this case.

The fifth factor -- the public interest in imposing a duty on Defendant -- weighs heavily in favor of doing so. The public interest in requiring Defendant to call EMS if a resident is so impaired that they cannot talk or walk is self-evident. In today's society, where addiction is commonplace, recovering addicts rely on and place their trust in residential facilities such as the Defendant's, to offer the help and support

necessary to overcome their addictions while keeping them safe during their residency. More importantly, Defendant promised to calling EMS upon observation of need. (ECF 10-2, ¶ 1). It is socially irresponsible for facilities such as Defendant to open their doors to people suffering from addiction, allow them to leave the facility, promise to provide a safe environment, and then not call for help when necessary. Defendant argues there is no public policy imposing a duty to protect Mr. Kinder, and imposing, "an affirmative duty to not only ensure that all residents were drug and alcohol free, but then to take some undefined steps in the event that the individual is found to have been under the influence, is not in the public interest." (ECF 13, pp. 12) (ECF 38, pp. 17-18).

Again, Defendant mischaracterizes Plaintiff's negligence case. Plaintiff is not alleging that Defendant had a duty to protect Mr. Kinder from self-inflicted harm, such as the ingestion of drugs off-property. There is simply no reference to that issue. (ECF 10,11. ¶43 a - m). Additionally, Plaintiffs are not suggesting that Defendant has to take "some undefined steps in the event that an individual is found to have been under the influence." To the contrary, Plaintiff simply contends that Defendant has to practice what it preaches and call EMS upon observation of need. This is a very defined step. The public interest is served if adult residential rehabilitation centers have a duty to call for EMS when a resident's condition warrants it. Imposing such a duty clearly promotes the public interest generally and specifically with regard to this vulnerable population. Not imposing such a duty is a recipe for disaster.

Defendant further argues that it did not take control of Mr. Kinder. Again, that is factually untrue. By allowing Mr. Kinder re-entry into its locked facility while totally incapacitated and helpless, the Defendant took control of Mr. Kinder. If Defendant did not exercise "control" over Mr. Kinder based upon the evidence adduced in this case, then the word "control" ceases to have meaning.

Defendant cites to *McCandless, v. Edwards,* 908 A.2d 900 (Pa. Super. 2006), for the proposition that the internal guidelines of a facility (methadone clinic) cannot operate to create a duty under Pennsylvania

law.[6] However, *McCandless* is so drastically different than this case, it is irrelevant to the duty analysis. In *McCandless*, a methadone addiction clinic prescribed medication to a patient, and the patient's nephew stole the medication and sold it to a third party. Id. at 902. The third party took the medication and died of an overdose. *Id*. at 902. Obviously, the third-party decedent was a total "stranger" to and did not have any relationship with the methadone clinic. The court determined that the methadone clinic did not have a relationship with the decedent, and therefore, no duty of care was created *de facto* as a matter of tort law in the Commonwealth, regardless of the clinic's internal regulations. *Id*. at 904.

Unlike *McCandless*, Defendant here had a direct and consequential relationship with Mr. Kinder, and had policies governing the relationship between them. Obviously, in *McCandless*, the clinic's internal operating policies were never intended to, nor could they, apply to a complete stranger who happened to come into possession of stolen medication legally distributed to a prescription holder. The duty at issue in this case -- a duty to call EMS—was a specific duty adopted by Defendant that directly applied to all of its residents, including Mr. Kinder. The *McCandless* court reached the conclusion it did because there was no relationship between the clinic and the decedent. Here, the exact opposite exits- a direct and consequential relation between the Defendant and decedent.

**CONCLUSION**

Based on Plaintiff's foregoing legal arguments, and given that there are clearly material facts in dispute, Defendant's Motion for Summary Judgment must denied.

Respectfully submitted,
**MATZUS LAW, LLC**

By: *Jason Matzus*

Jason E. Matzus, Esquire
Attorney for Plaintiff

---

[6] Defendant also relies upon *Klean W. Hollywood, LLC v Superior Court*, 230 Ca. Rptr. 3d 168, 21 Cal. App. 5th 70 (2018). *Klean*, a California case, is irrelevant to this analysis for the following reason. In *Klean*, the plaintiff sought to impose liability on a drug treatment facility for its failure to prevent the plaintiff from obtaining and using heroin. The Court concluded that the facility's failure to "thwart drug use" is not a basis to impose liability. Here, there are no claims asserted against Defendant concerning its failure to prevent Mr. Kinder from obtaining non-prescription medications.